Insul-Mastic Corporation of America v. Commissioner.
Insul-Mastic Corp. of America v. Commissioner
Docket No. 21622.
United States Tax Court
1950 Tax Ct. Memo LEXIS 156; 9 T.C.M. (CCH) 562; T.C.M. (RIA) 50167; June 30, 1950
*156 Held: (1) The salary of $25,000 paid by petitioner to its president in the years 1942 and 1943, and at that rate for the period January 1 to April 30, 1944, constituted reasonable compensation for services rendered by him to petitioner during such periods. (2) In computing the net operating loss carry-over from 1942 to subsequent years, petitioner, on the accrual basis, is not limited to the amount actually paid or accrued on its books as salary for that year, but is entitled to the sum of $25,000, for which amount the liability was fixed in 1942. William F. Knox, Esq., 1732 Oliver Bldg., Pittsburgh, Pa., for the petitioner. Louis A. Boxleitner, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies in income and declared value *157 excess-profits taxes as follows: Declared
Value
Excess-Profits
Year
Income Tax
Tax
1944
$4,195.10
$2,419.15
1945
1,046.25
The contested issue is whether a salary at the rate of $25,000 per year paid by petitioner to its president constitutes reasonable compensation for services rendered. In the event the answer is in the affirmative, an incidental issue arises as to whether petitioner, on the accrual basis, in computing its net operating loss carry-over from 1942, is limited to the amount of $16,249.97, the sum actually paid in 1942, the difference between $25,000 and that amount, or the sum of $8,750.03, not having been accrued on petitioner's books for that year. The case was submitted on oral testimony. Findings of Fact Petitioner is a Delaware corporation. From its incorporation until April 1, 1943 it maintained its principal office in New York City, and since that date in the City of Pittsburgh, Pennsylvania. It kept its books and made its returns on the accrual basis of accounting. Its income tax return for the year 1942 was filed with the collector of internal revenue for the third district of New York, and its returns for the *158 years 1943, 1944, and 1945 were filed with the collector of internal revenue for the twenty-third district of Pennsylvania. Petitioner was organized in 1940 by Leonard S. Davey of New York City, O. V. McGrew of Chicago, Illinois, and a Mr. Sheesley. It operated only as a sales corporation to market certain waterproofing and protective materials known as Insul-Mastic, for application on buildings and structures. It operated under a license agreement from McGrew, the owner of the patents and secret formulae for such materials. The application of Insul-Mastic materials required a special spraying machine developed by McGrew. The cost of said materials was two or three times that of paint but they had the advantage of a very much longer life. The Insul-Mastic materials and the spraying machines were manufactured by Insul-Mastic Laboratories, Inc., owned by McGrew. The license agreement between petitioner and McGrew gave petitioner the exclusive right to sell and apply Insul-Mastic materials and to sub-license others in the United States and foreign countries, subject to experimental licenses then outstanding for certain territory in Wisconsin, Florida and Illinois; a license to Dednox, *159 Inc., an Illinois corporation, limited to rolling stock uses in the United States; and a license to Insul-Mastic, Ltd., a Canadian corporation covering Canada and Newfoundland. It provided for the advancement by petitioner to McGrew of $125,000 over a period of years for the construction of a plant to manufacture Insul-Mastic materials, which was to be repaid, and the sale by McGrew or Insul-Mastic Laboratories, Inc., to petitioner of material and spraying machines. In March 1941 petitioner's only stockholders were Davey, McGrew and Sheesley, and they constituted its board of directors. Davey, who was then its president, was a certified public accountant. Neither he nor McGrew had any sales experience. In March 1941 Davey, with the consent and approval of the other stockholders, made an oral agreement with Leslie M. Johnston, then a resident of Pittsburgh, Pennsylvania, to become petitioner's president on a full-time basis as of May 1, 1941 at a salary of $25,000 per annum. In addition to his duties as president, Johnston was to be general sales manager, to supervise all sales and distribution of Insul-Mastic products, and particularly to develop a market for such products on *160 a national scale. During the month of April 1941, while he was still living in Pittsburgh, Johnston was on a part-time basis and was paid by petitioner for his services for said month the sum of $833.33. On May 1, 1941 Johnston went to New York City to give his full time to the duties and responsibilities assigned to him. He devoted between 10 and 12 hours a day to the business of petitioner until his resignation on April 11, 1944. He also served as a director from June 1941 until his designation in April 1944. Petitioner was authorized to issue 200,000 shares of common stock of the par value of one dollar per share until April 4, 1941, when its authorized capital was increased to 220,000 shares of common and 3,000 shares of 6% cumulative preferred shares of the par value of $100 per share. On November 10, 1941 its authorized capital was increased to 275,000 shares of common stock of the par value of one dollar. Between June 15, 1941 and July 12, 1943 petitioner issued a total of 2,020 shares of its preferred stock. No additional shares were issued thereafter. All voting powers were vested in the common stock. In March 1941, when Johnston agreed to become president of petitioner, *161 he owned no shares of its preferred or common stock. During his presidency he acquired 250 shares of the preferred stock, and from time to time acquired and disposed of a number of shares of common stock, his maximum holdings at any one time being 37,500 shares. At no time did his holdings of common shares exceed 17 per cent of the total outstanding shares. At the date of the hearing of this proceeding, Johnston owned no shares of petitioner's capital stock, and had no direct or indirect connection with it. After his graduation from Yale University in 1902, Johnston entered the employ of A. M. Byers Company, a manufacturer of wrought iron pipe. He remained with that company until 1930, serving in various capacities - puddler, roller, mill superintendent, assistant general superintendent, assistant general manager and treasurer, and vice-president in charge of sales. In the last named position it was his duty to develop the sale of the Byers Company's product. Jobbers were increased from four to 400 so that the company was regarded as the world's greatest manufacturer of wrought iron pipe. The stock control was in the Byers family. Johnston was a small stockholder. During the last *162 year or two of his employment by the A. M. Byers Company, Johnston received a salary of $19,000 plus a bonus, bringing his total yearly compensation to between $20,000 and $22,000. In February 1932, Johnston was requested by the president of the First National Bank of Pittsburgh to take charge of the Keystone Driller Company, which had been operated at a loss and was indebted to two Pittsburgh banks in the amount of about $400,000. From 1932 to 1934 he was paid a salary of $18,000. Thereafter he was on a part-time basis and received a salary of $8,000 a year, he having accepted, with the consent of his employers, the position as head of the Department of Public Workds of the City of Pittsburgh at a salary of $10,000 per annum. Between 1937 and April 1941, he was employed by the Cement Stone Company, which was organized to manufacture cement under a new process. This business was established by William P. Witherow for his son, and it was understood that Johnston's employment was on a temporary basis until the son acquired a knowledge of the business. Johnston received a salary of $10,000 per year from the Cement Stone Company. On May 1, 1941, when Johnston took over the presidency *163 of petitioner, it had only one other paid employee, a part-time secretary. Its gross sales for the period January 1 to April 30, 1941 amounted to $5,912.46. Insul-Mastic products were unknown, except one product known as Dednox, used in the railroad industry for coating box cars. Petitioner did not have a license to sell Dednox for rolling stock uses. Prior to May 1, 1941 a few experimental stations had been set up by McGrew and Davey to find out how to use the products. In 1941 and 1942 Johnston's main duty was the development of an organization and method of selling, to train employees in the uses and application of Insul-Mastic products and to provide selling tools in the form of literature for the use of petitioner's employees and its sublicensees. An expert advertising man was employed for this purpose in 1941. By November 17, 1942 Johnston had secured sublicensees of petitioner in various cities, to wit, Boston, Massachusetts; Providence, Rhode Island; Hartford, Connecticut; Ithaca and Batavia, New York; Philadelphia, Pennsylvania; Washington, D.C.; Baltimore, Maryland; Greensboro, North Carolina; Birmingham, Alabama; Fort Lauderdale, Florida; Cleveland, Ohio; Harvey, Illinois; *164 and Los Angeles, California, and in the counties of Hudson and Essex, New Jersey. In 1943 McGrew advised Johnston of a new product he had developed, called Insul-Mastic Glue. By agreement dated March 25, 1943, in consideration of the payment of $35,000 by petitioner to McGrew for the purpose of erecting a plant to manufacture the glue, petitioner was licensed to sell the product. Johnston was active in developing a market for this glue, which was used for waterproofing power train units manufactured for Russia by Westinghouse Electric Company, and also for waterproofing packages containing military supplies. After the war the Insul-Mastic materials were used very extensively by the Government for the protection of guns and airplanes in its storage program. After the retirement of Johnston as president, petitioner followed the same policy adopted by him in respect to setting up licensees, and continued the use of the principal brochures and literature developed under his regime. The gross sales of petitioner from January 21, 1941 to 1946, inclusive, were as follows: Jan. 1 to April 30, 1941
$ 5,912.46
Apr. 30 to Dec. 31, 1941
56,572.61
$ 62,485.07
1942
114,636.93
1943
192,666.03
Jan. 1 to Apr. 30, 1944
$67,269.63
Apr. 30 to Dec. 31, 1944
248,727.49
315,997.12
1945
357,027.76
1946
1,175,181.04
*165 In its income tax return for 1942 petitioner reported a net loss of $44,885.64. In said return a deduction of $16,249.97 was taken as compensation paid to Johnston. No entries were made in petitioner's books at the end of the calendar year 1942 to reflect the accrual of any unpaid compensation due to Johnston. Petitioner's operations for 1943 resulted in a loss of $1,659.61, as shown on its return. In such return a deduction of the $25,000 as the compensation for Johnston was claimed. Petitioner's operations for 1944, as shown on its income tax return for that year, resulted in a net income of $53,158.31 before deducting a net operating loss carry-over from prior years of $55,558.73. In determining its net operating loss for 1942 for carry-over purposes, petitioner deducted the sum of $8,750.03 for Johnston's salary not deducted on its 1942 return. In the 1944 return it claimed as a deduction the amount of $8,333.32 as Johnston's salary for the four-month period he served as president in that year. Petitioner's operations for 1945, as shown on its return for that year, resulted in a net income of $19,930.20, before applying a net operating loss carry-over from prior years of *166 $5,023.44. From some time in the middle of 1942 Johnston was currently paid at the rate of $10,000 per year. He was not paid the full amount of $25,000 per year because of the financial condition of the company. The balance of the salary due Johnston was accrued on the books of petitioner as of December 31, 1943, and thereafter, during the remainder of his employment, the difference between the amount of $25,000 and the amounts actually paid him was accrued on the petitioner's books at the end of each month. The balance due him was fully paid after his resignation as president became effective. Substantially all of the cash capital of petitioner was raised from the sale of preferred stock. Johnston sold $60,000 of it in April 1941. In all he sold about $200,000 of preferred stock, principally to his personal friends. The sale of petitioner's preferred stock was not one of the duties for which Johnston was paid a salary of $25,000. In determining the deficiencies for the taxable years involved herein the respondent disallowed as deductions $15,000 of Johnston's salary for the years 1942 and 1943 and $5,000 of the salary paid to him for the four months of 1944. The amount of *167 $25,000 paid by petitioner in the years 1942 and 1943 to its president, Leslie M. Johnston, as compensation for his services rendered to it in such years was reasonable. The amount of $8,333.32 paid to Johnston as compensation for services rendered to petitioner for the period January 1 to April 30, 1944 was reasonable. Opinion The primary issue presented is whether a salary of $25,000 paid by petitioner to its president, Leslie M. Johnston, for services rendered to it in the years 1942 and 1943, and the sum of $8,333.32 paid in the taxable year 1944 for services rendered for the period January 1 to April 30, 1944 were reasonable. The respondent allowed a deduction on the basis of $10,000 per annum. The taxable years before us are 1944 and 1945, but the years 1942 and 1943 are involved in computing the net loss carry-over from such years to the taxable years. Section 122, Internal Revenue Code. This record establishes that Johnston was employed in April 1941 by Leonard S. Davey, then president, to take over the presidency of petitioner on May 1, 1941, at a salary of $25,000 per anum. The agreement was made with the consent and approval of McGrew and Sheesley, *168 who organized petitioner, owned all of its issued capital stock and constituted the board of directors. At the time of his employment Johnston did not hold any of petitioner's capital stock. The agreement was the result of a free bargain made at arm's length. Furthermore, the record makes clear that the services of Johnston were desired by petitioner because of his already established qualifications and experience. These are detailed in our findings and need not be repeated here. They convincingly establish that Johnston was a capable executive and could demand substantial remuneration in the field where his experience could be utilized. Petitioner was a new corporation organized to promote the sales of new and untried products. It was Johnston's task to establish a sales organization that would function on a national scale. This required the location of sublicensees or jobbers in various cities, the preparation of literature to demonstrate the various uses to which the products could be put and the proper use of the special equipment for the application of the products. The normal difficulty of such a task is apparent. The impact of the war obviously rendered the task more difficult. *169 The success that Johnston was able to achieve is demonstrated by the continuous and progressive increase in the gross sales, not only during the period in which he served as president but in subsequent years as a result of the ground work he laid. The respondent argues that the salary agreed to be paid Johnston was excessive because the earnings of petitioner in the periods involved were not sufficient to make current payment of the entire amount. Such circumstance is not controlling. It is common knowledge that new industries often suffer initial periods of loss. Where one is engaged at a fixed compensation, it may be of little if any importance that the earnings are insufficient at the moment to meet the payments. Such is especially so where the venture is new and untried. The fact that Johnston did not insist on full current payment of his agreed salary does not, we think, furnish a sufficient basis for concluding it was excessive. The fact is that the agreed salary was eventually paid. The respondent argues that petitioner has offered no evidence as to compensation paid for similar services by comparable enterprises. Petitioner says such testimony was not available because *170 of the lack of proper comparatives. While a comparative test is one of the factors ordinarily to be considered, where both the business and the services performed are unique in the field, the absence of testimony of such character is of no substantial significance. Petitioner offered the testimony of Davey, who made the contract with Johnston, of Off, who succeeded Johnston, as president of petitioner, and of Oliver, a stockholder and director, all of whom were familiar with the services rendered by Johnston. All expressed the opinion that the salary of $25,000 paid to Johnston was reasonable. Oliver for many years was an officer of Newspaper Printing Company, publishing the Gazette Times and Chronicle Telegraph in the City of Pittsburgh; later, chairman of the board of directors of the Pittsburgh Coal Company, and chairman of the finance committee of the Pittsburgh Consolidation Coal Company, and a director thereof. The respondent suggests that the testimony of these three individuals should not be accepted because of their interest as stockholders and directors. Of course we are not bound by the opinion expressed by such witnesses. However, all are men of character and experience. *171 We regard them as qualified witnesses. Their testimony stands unimpeached and uncontradicted. On all the facts and circumstances disclosed by this record, we have found as a fact that the compensation paid by petitioner for services rendered to it by Johnston as president, at the rate of $25,000 per year, is reasonable, and therefore constitutes a proper deduction under section 23(a)(1)(A) of the Internal Revenue Code. Such holding requires a determination of the collateral issue raised by the respondent, as to whether petitioner is limited to the amount of $16,249.97 shown on its books as salary paid to Johnston in 1942, in computing the net operating loss carry-over from 1942 to subsequent years. It appears that petitioner did not accrue on its books in 1942 the difference between the agreed salary of $25,000 and the amount of $16,249.97 actually paid, or the sum of $8,750.03. Petitioner was on an accrual basis of accounting, the liability was fixed, and the fact that petitioner neglected to make the proper entry on its books or claim a deduction on its 1942 return of the amount it was entitled to accrue does not deprive petitioner of the right to use the *172 amount of $25,000 in computing its net operating loss carry-over from 1942 to subsequent years. When all events have occurred which control any tax deduction, the same is allowable even though the books may be silent. Black Motor Co., Inc., 41 B.T.A. 300; Wolf Manufacturing Co., 10 B.T.A. 1161; The Texas Company (South America) Ltd., 9 T.C. 78; Orono Pulp & Paper Co. v. Tibbetts, 34 Fed. (2d) 714. Decision will be entered under Rule 50.